

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BERNARD WALTER CHRISTMANN, | § | No. 08-23-00338-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 243rd Judicial District Court |
| | § | |
| THE STATE OF TEXAS | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20220D00631) |
| | § | |

**MEMORANDUM OPINION**

Following a jury trial, Bernard Christmann was convicted of murder and sentenced to life in prison. On appeal, Christmann challenges evidentiary rulings of the trial court, and complains it erred by excusing two jurors, one before the jury was sworn and the other shortly thereafter. Finding no error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Elaine Christmann[1] worked at the El Paso International Airport as a Southwest Airlines customer service representative. In August 2020, Elaine met and began dating Juan Anzaldo, a co-

---

[1] For clarity and brevity, we refer to Elaine Christmann by her given name and to Bernard Christmann by his surname.

worker who also worked at the airport. At the time, Elaine was married to Christmann, but she described at trial that they had issues. Elaine testified that she and Christmann wed in 2004 but he had moved out of their home in October 2020, shortly after she started dating Anzaldo. Still, Christmann moved back in with her when his lease ended in November 2021. Elaine clarified that she and Christmann had separated but they were not divorced.

On November 19, 2021, at approximately 9:30 p.m., Anzaldo ended his shift of work and soon walked to his vehicle parked in the employee parking lot of the airport. About the same time, Erick Solis, a co-worker and close friend, continued to work inside the airport. Solis next received a call from Anzaldo reporting that his front tire had been slashed. When Solis asked Anzaldo who he thought would have done it, Anzaldo answered by saying "perhaps" it was "Elaine's husband." Staying on the call, Solis soon heard a male voice asking Anzaldo if he needed help. Anzaldo responded twice saying, "No, I'm good." Next, Solis described that it sounded to him as if Anzaldo was being attacked. He heard a sound, like "someone getting hit." Solis next heard Anzaldo say "Ayudame" three times, wherein he pleaded for help in Spanish. At that point, Solis ran out to the employee parking lot. Along the way, he ran into co-worker Albert Diaz. He said to him, "Albert, come. They're jumping Juan." Diaz joined Solis and the two ran to the lot. Another employee, Fernando, joined in to help.

As the group approached the parking lot, Solis saw a person exiting on foot. He described the individual as a "chubby" man, not that tall, who was wearing a black hoodie and dark pants. Solis believed this person must have been the one who had attacked Anzaldo as no one else appeared to be in the lot. When Solis called out to him to stop, the man refused and continued to walk at a somewhat faster pace. Solis noticed the man walked with a limp. Solis next found Anzaldo laying on the ground and in bad condition. He described that "[Anzaldo's] head was all

2

destroyed." Solis testified he believed he witnessed Anzaldo take his last breath of life as his breathing soon stopped. Solis called 911 with Anzaldo's nearby phone.

Like Solis, Albert Diaz also testified at trial. He described that, after running to the lot, he and Solis separated at a point when Diaz saw a man coming from the employee parking lot. Diaz followed the man as he walked briskly toward a nearby hotel, calling 911 as he walked. When an operator answered, he gave a play-by-play of their movements. Once the man reached a parking lot of the hotel, Diaz watched as he climbed into a gray pickup truck and drove from the scene. Diaz generally described the truck as having two doors and two side doors that opened "like a half--half cabin." He also noticed the truck had a dent in the back of it, and its paint job had noticeably faded such that it appeared in places as if it was gone entirely. Although Diaz looked for the license plate number, he was not able to see it.

El Paso Police officers who responded to the scene interviewed several airport employees. A customer service agent who testified at trial informed them that evening that Anzaldo had been in a public relationship with Elain while she remained married to Christmann. The agent expressed her suspicions about Christmann being involved in Anzaldo's attack as he matched the physical description given by Solis and Diaz. She also reported that Christmann drove a gray truck. Officers soon confirmed the Christmann's owned a gray 2002 Ford F-150 pickup truck. When they located a vehicle matching the description at the Christmann residence, they saw that it had a dent in the back tailgate and a faded paintjob.[2] Officers obtained a warrant to search the vehicle, which they performed once the vehicle was stored at the crime scene's vehicle impound lot.

Officer Castillo, a crime scene specialist, testified he located and seized a notebook and several loose pieces of paper from inside the vehicle he searched. A paper found inside the

---

[2] Elaine testified the 2002 Ford F-150 was registered in her name but it was primarily driven by Christmann.

3

notebook included handwriting that listed Anzaldo's name and address. And other names and addresses were also listed. Officer Castillo also found a loose paper with a Southwest Airlines customer-service schedule. It showed that it was Elaine's schedule, but it also included handwriting on the back side, which included weekly dates, schedule times, and notes such as "already here." The other loose piece of paper was a Southwest Airlines operation agent's bid sheet, which reflected Anzaldo's work schedule. In addition to seizing items, Officer Castillo also swabbed areas of the inside of the truck where he suspected he had observed blood. He swabbed an area on the steering wheel and another area underneath the hand grip of the interior door. The State's DNA expert testified the swabbed specimens contained blood from a single individual. Specifically, the expert testified: "It's 192 sextillion times greater obtaining the profile if it came from Mr. Anzaldo versus a random individual." In other words, the expert described that Anzaldo could *not* be excluded as the single contributor of the blood that was swabbed from the steering wheel and hand grip of the gray truck. As to both areas swabbed, the expert also concluded that Christmann was excluded as a contributor.

The chief medical examiner of El Paso County testified that blunt force injuries to Anzaldo's head caused his death. He identified that Anzaldo had 12 separate injuries that could have each been caused by separate blows. Although the doctor opined that Anzaldo had been hit with a significant amount of force by a blunt object, he expressed no further opinion as to the characterization of the object used.

After the State rested its case in chief and the trial court denied Christmann's motion for directed verdict, Christmann called two witnesses to testify. First, a friend who knew Christmann for up to 12 years testified he was a "very peaceful" person. Second, a criminal defense investigator

4

testified he searched a website available to licensed investigators and learned that approximately 24,000 F-150 pick-up trucks were registered to owners in El Paso County.

The jury returned a verdict of guilty and sentenced Christmann to life in prison. Christmann filed a motion for new trial, which was overruled by operation of law. This appeal followed.

## II. ISSUES ON APPEAL

Christmann advances three issues on appeal. In general terms, the issues challenge: (1) the denial of his motion to suppress evidence, urging the probable cause affidavit violated his Fourth Amendment rights, (2) the admission of handwritings into evidence, and (3) the excusing of two members of the jury panel who primarily answered in Spanish when questioned by counsel and the trial court. We address each issue in turn.

## III. MOTION TO SUPPRESS

In his first issue, Christmann claims the trial court abused its discretion by denying his motion to suppress evidence because the probable cause affidavit for the warrants violated the Fourth Amendment and Article I, § 9 of the Texas Constitution. He challenges the denial of his motion to suppress in two sub-issues arguing that: (1) the affidavit supporting the search warrant contained deliberate misrepresentations under *Franks v. Delaware*, and it failed to articulate probable cause; and (2) the search warrant lacked specificity.

### A. Constitutional principles and standard of review

The United States and Texas constitutions provide that no search warrant shall issue except upon probable cause as supported by an oath or affirmation. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9. Similarly, the Texas Code of Criminal Procedure provides that no search warrant shall issue except upon an affidavit establishing probable cause. *See* Tex. Code Crim. Proc. Ann. art. 18.01(b). At the core of the Fourth Amendment, and its Texas equivalent, is the

5

fundamental principle "that a magistrate shall not issue a search warrant without first finding probable cause that a particular item will be found in a particular location." *Foreman v. State*, 613 S.W.3d 160, 163 (Tex. Crim. App. 2020) (internal quotations omitted); *see Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).

We generally review a trial court's decision on a motion to suppress under a bifurcated standard, giving almost total deference to the trial court's findings of historical facts but reviewing *de novo* its application of the law to the facts. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). However, when the trial court is determining probable cause to support issuance of a search warrant, there are no credibility determinations; rather, the trial court is constrained to the four corners of the affidavit. *Id.* Accordingly, when reviewing the magistrate's decision to issue a warrant, we apply a highly deferential standard because of the constitutional preference for searches to be conducted pursuant to a warrant. *Id.* As long as the magistrate had a substantial basis for concluding probable cause existed, we will uphold the magistrate's decision. *Id.* We may not analyze the affidavit in a "hyper-technical manner" and instead should interpret it in "a commonsensical and realistic manner," deferring to all reasonable inferences that the magistrate could have made. *Id.* "Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the specified location." *Id.* at 272.

**B. Analysis**

**(1) The affidavits**

First, Christmann asserts the trial court erred in ruling against his *Franks'* challenge, contending the supporting affidavit to the search warrants contained material misrepresentations. At trial, Christmann's motion to suppress specifically argued the supporting affidavit of Detective

6

Collaso included misrepresentations. This argument attacks the affidavit in support of the warrant issued the day following the murder, which authorized a search of Christmann's pick-up truck. There were two different search warrants issued, which were nearly identical, except the first one pertained to a 2020 Gray Ford F150, and the second one pertained to a 2002 Gray Ford F150. As Elaine Christmann testified, she drove the 2020 truck and Christmann drove the 2002 truck. She also testified that the 2002 truck had sun damage to its hood and a dent on the right side of the tailgate.

### (a)    Applicable law and standard of review

In *Franks v. Delaware*, the United States Supreme Court held that if a defendant establishes by a preponderance of the evidence that the probable cause affidavit includes a false statement that was made knowingly, intentionally, or with reckless disregard for the truth, and the false statement is necessary to establish probable cause, the search warrant is invalid under the Fourth Amendment. 438 U.S. 154 (1978). Applying *Franks*, the Court of Criminal Appeals has held that a misstatement in an affidavit that is the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not invalidate a warrant. *Dancy v. State*, 728 S.W.2d 772, 783 (Tex. Crim. App. 1987) (en banc) (citing *Franks*, 438 U.S. at 170). An affidavit supporting a search warrant begins with a presumption of validity. *Franks*, 438 U.S. at 171; *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). Consequently, the defendant has the burden to rebut that presumption by proving by a preponderance of the evidence that the affiant made the false statement deliberately or with a reckless disregard for the truth. *Franks*, 438 U.S. at 156. The defendant must also show that absent the false information, the remaining content is insufficient for probable cause. *Franks*, 438 U.S. at 156, 171–72.

7

To be entitled to an evidentiary hearing based on *Franks*, the defendant must do the following:

(1) Allege deliberate falsehood or reckless disregard for the truth by the affiant, specifically, pointing out the affidavit claimed to be false;

(2) Accompany these allegations with an offer of proof stating the supporting reasons; and

(3) Show that when the portion of the affidavit alleged to be false is excised from the affidavit, the remaining content is insufficient to support the issuance of the warrant.

*Cates*, 120 S.W.3d at 356. If a defendant establishes perjury or reckless disregard by preponderance of the evidence, and the affidavit's remaining content is insufficient to establish probable cause after setting aside the affidavit's false material, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

We review the trial court's decision under *Franks* under a mixed standard of review, granting "almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor while we review *de novo* application-of-law-to-fact questions that do not turn on credibility and demeanor." *State v. Verde*, 432 S.W.3d 475, 481 (Tex. App.—Texarkana 2014, pet. ref'd). "Because the trial court did not make explicit findings of fact, we must review the evidence in a light most favorable to the trial court's ruling." *Black v. State*, 08-12-00338-CR, 2015 WL 5604388, at *9 (Tex. App.—El Paso Sept. 23, 2015) (not designated for publication).

**(b)  Analysis**

Here, the affidavit at issue described the information that officers learned from their initial investigation—primarily, their on the scene interviews of witnesses who described that a man was

seen fleeing from where Anzaldo had been attacked, that the man ran towards a nearby hotel, and that he sped off in a gray pick-up truck—and other information they obtained from the airport and hotel's surveillance videos, which depicted a man running into the parking lot and getting into a gray truck with a dent in the back tailgate. Additionally, the affidavit stated that, after speaking with witnesses, officers learned Anzaldo had been openly dating Elaine, who was married to Christmann. The first affidavit also contained the following statements:

> Officers were then able to locate a vehicle matching the description provided by the units on the scene. The officers followed the vehicle to where suspected party #1 [Elaine] resides. The officers did observe the unknown male exit the vehicle and enter the residence. The vehicle the officers had followed to address, which belongs to suspected party #1, and had the same dent that was seen on the video.

> The affiant utilizing law enforcement data bases found that the specific vehicle had been in the area of the airport November 11[], 2021 and the 14th of November, 2021.

The first prong of *Franks* requires that Christmann allege the affiant's deliberate falsehood, or reckless disregard for the truth, and point out the falsity thereto. *See Cates*, 120 S.W.3d at 356. As to the first affidavit, Christmann argued the inclusion of the statement that "officers followed the vehicle to where suspected party #1 resides" was false because officers had not in fact followed Christmann to his residence. The trial court rejected his contention that this particular phrase implied that officers had actively followed Christmann from the scene of the crime to his residence. But even if the trial court believed that Detective Collaso had misstated that officers "followed" the truck to the residence, a misstatement in an affidavit may only be struck if it is "made with the type of knowledge, intent, or recklessness as contemplated by *Franks*." *Dancy*, 728 S.W.2d at 782. In other words, Christmann must show that Detective Collaso made the statement perjuriously or with reckless disregard for the truth. *Id.* "A misstatement in an affidavit that is merely the result of

9

simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not render invalid the warrant based on it." *Id.* at 783.

Here, Christmann's alleged insinuation is insufficient to establish that Detective Collaso recklessly disregarded the truth in his affidavit as we presume the trial court resolved any conflicting evidence in favor of its ruling. *See Aceves v. State*, No. 08-14-00008-CR, 2016 WL 323825, at *4 (Tex. App.—El Paso Jan. 27, 2016, no pet.) (not designated for publication) ("The trial court as fact finder has the power to resolve conflicting evidence and believe all, some, or none of the testimony, contradicted or otherwise."). Accordingly, Christmann fails to satisfy the first prong of *Franks*, which required that he show Detective Collaso knowingly and intentionally included a statement in the search warrant affidavit which was false or that he made such a statement in reckless disregard for the truth. *Davila v. State*, 871 S.W.2d 806, 813 (Tex. App.—Corpus Christi–Edinburg 1994, pet. ref'd); *Aceves*, 2016 WL 323825, at *4.

For the second prong of *Franks*, Christmann points to a police report as evidence that Detective Collaso's statements were false. In the report, Officer J. Longenbaugh stated he was dispatched to the residence "that was connected to the homicide" and he observed a male subject exit the front door and walk towards "an older model Ford F150." Additionally, Christmann points to the search warrant for Christmann's cell phone, which is not at issue in this appeal, where Detective Collaso stated the truck was "located" and "discovered." The affidavit did not use the same "followed" language. Christmann asserts the change of language shows Detective Collaso originally made a false statement. We disagree. *Franks* requires that a defendant must accompany his allegations of falsity with an offer of proof, affidavit, or other reliable witness statements, unless their absence is "satisfactorily explained." *Cates*, 120 S.W.3d at 358 (citing *Franks*, 438

10

U.S. at 171); *Ramsey*, 579 S.W.2d at 922. Christmann's attempt to point to police reports and other search warrants in the record fails to meet this burden.

Finally, Christmann contends that if the complained of statement is struck from the affidavit, the only remaining information of the affidavit reflected that Elaine was in a dating relationship with the victim, and he argues the information would have been insufficient to establish probable cause. We disagree. The information in the affidavit showed that, through their initial investigation, police officers learned from the witnesses what they heard and saw in the airport parking lot, obtained video from the airport and hotel showing the fleeing man get into a gray color Ford F150, that Anzaldo was in a dating relationship with Elaine, and that the truck matching the description was located at Christmann's residence. Even striking the challenged portion of the affidavit, it is clear that officers knew witnesses saw a man leave the scene where Anzaldo was attacked and the individual got into a gray pick-up truck. They were also able to get a description of the truck, specifically that it included a dent on the right side of the back of the tailgate and a fading paintjob. They also learned that Anzaldo was in a relationship with Elaine. Once at the Christmann residence, officers located and observed a vehicle matching the description given by the eye-witness.

Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a "fair probability" or "substantial chance" that contraband or evidence of a crime will be found at the specified location. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). Probable cause for a search warrant does not require that, more likely than not, the item or items in question will be found at the specified location. *Id.* When reviewing a motion to suppress evidence seized pursuant to a search warrant, a trial court is limited to the four corners of the affidavit supporting the warrant; consequently, the court makes

11

no factual or credibility determinations. *McLain*, 337 S.W.3d at 271. We will uphold the magistrate's probable cause determination as long as the magistrate had a substantial basis for concluding that probable cause existed. *Id.*; *Robinson v. State*, 368 S.W.3d 588, 598 (Tex. App.—Austin 2012, pet. ref d).

Accordingly, we conclude the remaining portions of the affidavit would provide probable cause to believe evidence of the murder would be found at the location for which the warrant was sought. Additionally, a magistrate could have reasonably inferred that it was fairly probable that Christmann was involved in Anzaldo's murder, he fled the scene in a gray truck, and that evidence pertaining to Anzaldo's murder would be found in the truck. *See Robinson*, 368 S.W.3d at 598 (considering the totality of the affidavit to conclude the magistrate reasonably inferred the evidence relating to the shooting would be found in the defendant's SUV because it was used to flee the crime scene). We overrule the first sub-issue of Christmann's first issue as it pertains to the *Franks* argument and the sufficiency of the probable cause to support the search warrant.

### (2) The specificity of the search warrant

Christmann also asserts the search warrant allowed an overbroad search by failing to specify the items to be seized and their connection to the crime. Christmann contends the DNA swabs, notebook, and sheets of paper collected from the 2002 gray truck should have been suppressed because they were not specifically identified to be seized in the search warrant.

### (a) Applicable law

The Fourth Amendment to the United States Constitution requires that things to be seized should be described with particularity, which makes general searches impossible. Tex. Code Crim. Proc. Ann. art. 18.01(b); *Stanford v. Texas*, 379 U.S. 476, 485 (1965); *Gonzales v. State*, 577 S.W.2d 226, 228 (Tex. Crim. App. [Panel Op.] 1979). The items to be seized must be described

with sufficient particularity such that the executing officer is not left with any discretion to decide what items may be seized." *Thacker v. State*, 889 S.W.2d 380, 389 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd); *see also Gonzales*, 577 S.W.2d at 228. However, the requirements for the particularity of a description of an item may vary according to the nature of the thing to be seized. *Gonzales*, 577 S.W.2d at 228. When the affidavit in support of the search warrant is incorporated into the warrant, the two may be considered together in construing the warrant. *See Long v. State*, 132 S.W.3d 443, 446 n.11 (Tex. Crim. App. 2004) (considering affidavit incorporated by reference into warrant in defining the place to be searched; stating that "the description in the affidavit controls over the language in the warrant itself"). In determining whether a search and seizure fell within the warrant's scope, we "follow a common sense and practical approach, not a 'Procrustean' or overly technical one." *Id.* at 448. The degree of specificity required is flexible and will vary according to the crime being investigated, the item being searched, and the types of items being sought. *Thacker*, 889 S.W.2d at 389.

The warrant seeks authority to search for and seize the following items located in the 2002 gray truck:

> Microscopic evidence visible and not visible to the naked eye to include but not limited to photos and forensic scans documenting of both the interior and exterior of the vehicle, latent fingerprints, blood (DNA) Deoxyribonucleic Acid Evidence, hair and fibers, bodily fluids, biological tissue that may have come from the suspected parties. Any object used to cause serious bodily or death of an individual, weapons, Clubs, knives, and holsters for knives, and cutting instruments. Any fire arms, ammunition for firearms, spent shell casings, holsters, any all safes and any purchase receipts for firearms. Any and all personal identifying information to include wallets and any and all form of identification. Clothing that may have been worn by the Offender at the time of the offense.

### (b) Analysis

Christmann characterizes the warrant as including "boiler plate language," contending it was too generic. We disagree.

The search warrant authorized the search of the 2002 gray truck for evidence used in commission of the offense of murder and explicitly incorporated the attached affidavit. In the affidavit, Detective Collaso established a nexus between the 2002 truck and the murder being investigated by stating the truck was believed to be used by the suspect to flee the scene of the murder. The affidavit sufficiently supports the search for forensic type evidence where Christmann may have touched, interior and exterior. Additionally, the affidavit supports the search for other identifying information that would tend to connect Christmann to the murder—the notebook and papers containing Anzaldo's name, address, and what appeared to reflect a schedule.

The supporting affidavit made clear that the search was for evidence relating to the murder investigation. Any ambiguity or potential for the search warrant being overbroad was cured by the limitation of the search to evidence that was linked to the offense. *See Diaz v. State*, 604 S.W.3d 595, 607 (Tex. App.—Houston [14th Dist.] 2020), *aff'd*, 632 S.W.3d 889 (Tex. Crim. App. 2021). To the extent Christmann contends the notebook papers were not specifically named in the search warrant, the evidence constituted plain-view evidence that was seized during a good-faith search conducted within the parameters of a valid search warrant. *See Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991) (en banc) (applying the plain view exception when: (1) the officer must be in a proper position to view the item or lawfully be on the premises and (2) the fact that the officer has discovered evidence must be immediately apparent). Given that the notebook papers

were found in the center console in the truck and contained Anzaldo's information, it was reasonable the officers determined the items were reasonably related to Anzaldo's murder.[3]

Giving the challenged language its common sense and practical meaning, and considering the crime being investigated, the nature of the search, and the items sought, the warrant authorized collection of DNA swabs, and seizure of a notebook and loose-leaf sheets of paper. S*ee Long*, 132 S.W.3d at 448. We overrule the second sub-issue of the first issue.

Accordingly, we overrule Christmann's first issue.

## IV. EVIDENTIARY RULINGS

In his second issue, Christmann asserts the trial court abused its discretion by admitting four different items of evidence. The challenged evidence consisted of: (1) a document identified as a Southwest Airlines' operations agent's bid sheet (State's Exhibit 21); (2) a two-sided document identified as a Southwest Airlines' customer-service schedule containing handwriting on its back side (State's Exhibits 22 and 23, consisting of a notebook containing a page with handwriting); and (3) a photograph of a page of a spiral notebook containing a handwritten list of names and addresses (State's Exhibit 25). Christmann urges the three challenged exhibits were not properly authenticated; and each was overly prejudicial.

### A. Relevant factual background

The State laid the foundation for the admission of the challenged exhibits through three different witnesses. First, Officer Castillo testified he executed the search warrant on the

---

[3] In his reply brief, Christmann contends the notebook and papers were "personal writings" and not subject to seizure because of the limitation of Article 18.02(a)(10). *See* Tex. Code Crim. Proc. art. 18.02(a)(10) (allowing search warrants to be issues for the search and seizure of "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense"). In reviewing Christmann's motion to suppress, hearing on his motion, and objections at trial, Christmann did not preserve this complaint for appellate review. Tex. R. App. P. 33.1(a).

Christmann's 2002 pickup truck. Inside, he found a notebook with handwritten notes; and the notebook also contained two other loose sheets of paper. He testified he found the items underneath the vehicle's center console. Additionally, he testified the items were tested for fingerprints but yielded negative results. Christmann lodged a relevancy objection, which the trial court sustained.

Next, Elaine Christmann identified Exhibit 21 as a Southwest Airlines' bid sheet used by employees to pick their work-shifts. The State sought to admit State's Exhibit 21, but Christmann objected arguing improper authentication, hearsay, and relevance. Outside the presence of the jury, Christmann argued that, although Elaine could identify the bid sheet, she could not tie the document to Christmann. In response, the State argued it could be tied to Christmann because it was found in the truck he regularly drove. The trial court sustained the objection and did not admit the bid sheet at that time. Additionally, Elaine identified State's Exhibit 22 as her work schedule while noting it included handwriting on its back side. The handwritten notes contained different days of the week, with different times next to the days of the week, and notes in parenthesis stating: "already here," "working," and "already gone." When asked whether the handwriting on the back belonged to her, she responded "possibly." Further, when asked whether the handwriting belonged to Christmann, she responded she did not know. The State moved to admit Exhibit 22 and Christmann objected on the same basis. The trial court overruled the objection and admitted the evidence. Elaine also identified State's Exhibit 23 as a notebook and State's Exhibit 25 as a picture of a page in the notebook with handwriting. The handwritten notes on this page included a heading stating, "Truepeoplesearch.com," and four different names with addresses below each name. Anzaldo's name was listed with two different addresses. When asked if the notebook belonged to her, Elaine responded "could be." As to the page with handwritten notes, she answered she had never seen it before, and the handwriting was not hers. When asked if the handwriting belonged

16

to Christmann, she answered she did not know because both her children and Christmann had similar handwriting. When the State offered the exhibit for admission, Christmann objected based on relevancy, authenticity, hearsay, and that it was more prejudicial than probative. The trial court sustained the objection on the basis that Elaine did not recognize the handwriting.

Finally, co-worker Solis identified State's Exhibit 21 as an operations schedule used by Southwest Airlines. Christmann re-urged his previous objections, and the trial court admitted the evidence over his objections. Solis testified the document was titled "El Paso operations bid," explaining it was used by employees to pick their schedules on a month-to-month basis. Employees with the highest seniority were allowed to pick preferred days earlier than others. Based on the schedule, Solis testified that Anzaldo had Mondays and Tuesdays off, otherwise his shifts ended at 9:30 p.m.

At this point, the State recalled Officer Castillo where he reiterated that State's Exhibit 23 was the notebook obtained from inside the pickup truck and State's Exhibit 25 was a photo he took of the page from the notebook. The State moved to admit both exhibits and Christmann objected based on lack of authenticity, hearsay, and relevance. The State responded that Officer Castillo had properly identified the exhibits, that hearsay was not implicated because out of court statements were not being offered for their truth, and the notebook was relevant because it contained information regarding Anzaldo. The trial court admitted the exhibits over Christmann's objections.

Christmann contends Exhibits 21, 22, 23, and 25 were erroneously admitted, that each improperly bolstered the State's case, and the evidence invaded the province of the jury. Christmann contends that because Elaine was unable to identify the handwriting on the papers, the

State failed to authenticate the handwritten statements with evidence sufficient to support a finding that the writings were in fact what the State claimed them to be.

## B. Standard of review

We review a trial court's evidentiary rulings under an abuse of discretion. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). If the trial court's ruling that a jury could reasonably find proffered evidence authentic is at least "within the zone of reasonable disagreement," a reviewing court should not interfere. *Id.* The Court of Criminal Appeals has held that "it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Id.* at 848–49 (quoting *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015)).

## C. Analysis

### (1) Evidence authentication

Rule 901 provides:

> (a) To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

Tex. R. Evid. 901(a). Authenticity may be established with testimony of a witness with knowledge, which includes "[t]estimony that an item is what it is claimed to be." *Id*. at (b)(1).

The State relied on a series of witnesses to establish the authenticity of the challenged exhibits, which included a Southwest Airlines' operations agent's bid sheet (State's Exhibit 21), a two-sided customer-service schedule containing handwriting on its back side (State's Exhibits 22 and 23), and a photograph of a page of a spiral notebook that depicted a handwritten list of names and addresses to include information about Anzaldo (State's Exhibit 25).

First, Officer Castillo testified about the spiral notebook and papers found in Christmann's vehicle, or all of the challenged items. As he described, the papers included bits of information about Anzaldo. The circumstances of how the papers were found and what could be gleaned from them supported a preliminary determination that the items of evidence were in fact what the State had purported them to be. *See Hall v. State*, No. 01-15-00568-CR, 2016 WL 5480896, at *6 (Tex. App.—Houston [1st Dist.] Sept. 29, 2016, no pet.) (mem. op., not designated for publication) (holding a drug ledger was sufficiently authenticated when the investigator testified it was found in appellant's house where he was arrested and the ledger contained prior drug transactions connected to appellant); *Keck v. State*, No. 14-07-00933-CR, 2009 WL 3003257, at *5 (Tex. App.—Houston [14th Dist.] Apr. 2, 2009, no pet.) (mem. op.) (holding authorship may be established circumstantially with testimony that only appellant had access to the bank deposits).

Second, Solis testified that the Southwest Airlines' bid sheet, with which he was familiar as an employee, reflected Anzaldo's work schedule. Third, Elaine testified that the customer-service schedule reflected her schedule during the relevant time. Because the documents included information pertaining to Elaine and Anzaldo, and they were located in the truck that Christmann drove, they were properly authenticated. *See Butler*, 459 S.W.3d at 600 (noting that various forms of written communication "may sometimes be authenticated by distinctive characteristics found with the writings themselves and by comparative reference from those characteristics to other circumstances shown to exist by the evidence presented at trial"). We conclude that handwriting analysis was not required to authenticate the documents because they were properly authenticated through circumstantial evidence. *See id.*; *see also United States v. Ceballos*, 789 F.3d 607, 620 (5th Cir. 2015) (holding lack of handwriting analysis was not dispositive and the admission of a notebook was not error when circumstantial evidence of defendant possessing the notebook and

19

its corroboration of smuggling activity rendered the authorship of the writings less important); *U.S. v. Wake*, 948 F.2d 1422, 1434–35 (5th Cir. 1991) (holding the lack of handwriting analysis did not bar admission of evidence when there was other circumstantial evidence through the testimony of an investigating officer to authenticate the writings contained in "tally sheets" found in defendant's office).

Once the State made a preliminary showing of authenticity, the ultimate responsibility for determining whether evidence in fact reflected what the State claimed it did, rested with the jury. *Fowler*, 544 S.W.3d at 848. Therefore, we conclude the trial court did not abuse its discretion in overruling Christmann's authenticity objection and admitting the challenged items of evidence.

### (2) Unfair prejudice

Christmann contends the trial court erred in failing to exclude the challenged evidence based on his claim that all four items were overly prejudicial. Texas Rule of Evidence 403 provides that a trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading to the jury, causes undue delay, or needlessly presents cumulative evidence. Tex. R. Evid. 403. We evaluate the following four factors when conducting a rule 403 analysis: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W3d 435, 440 (Tex. Crim. App. 2005). This balancing test "is always slanted toward admission, not exclusion, of otherwise relevant evidence." *De La Paz*, 279 S.W.3d at 343.

Here, the evidence generally provided work schedules for Anzaldo and Elaine. The challenged items of evidence were located in the truck that Christmann regularly drove. The evidence was probative as rebuttal evidence to Christmann's defensive theory asserting that

thousands of similar trucks were registered to owners in the city and his truck was not in fact the same one that drove away from the general area of where Anzaldo was attacked on the night in question. The State offered the evidence to establish that the truck that was distinctively identified as fleeing from the scene on the night in question and it contained Anzaldo's work schedule inside its interior. Accordingly, the probative value of the evidence weighed in favor of admission. Moreover, there is no indication the challenged evidence had the potential to impress the jury in some irrational but indelible way. Christmann contends the challenged evidence misled the jury insofar as the jury inferred from the writings that were included were in fact made by Christmann. We disagree. The State established the evidence was found in Christmann's truck. Even if he did not author the handwritten notes, Anzaldo's address and work schedule were accessible to him and in a vehicle he controlled. We find the four factors considered do not weigh against admission. Although the State relied on three different witnesses in seeking admission of the challenged evidence, the balance of the factors weigh in favor of admission and the trial court did not err in admitting the evidence. *Mechler*, 153 S.W3d at 440.[4]

We overrule Christmann's second issue.

## V. EXCUSED JURORS

In his third issue, Christmann contends the trial court erred by excusing two Spanish speaking jurors from jury service.

### A. Relevant factual background

Following a full day of voir dire and strikes for cause, the clerk of the court called the names of jury panelist who were not struck by either party. The clerk then took a roll to ensure that

---

[4] To the extent Christmann contends the handwritten notes were inadmissible hearsay, he does not develop a hearsay challenge in his brief. *See* Tex. R. App. P. 38.1(i).

each juror responded as present when called. While other jurors answered, "Here," Venireperson 64, who would be seated as Juror 12, answered "*Aqui*," identifying herself in Spanish. After the court asked her for an answer in English, Venireperson 64 complied. At a bench conference, Christmann asked for the trial court to clarify with Venireperson 64 that she understood and spoke English. Outside the presence of the other jurors, the trial court asked Venireperson 64 why she had answered in Spanish. Responding, she explained that she did not fully write or read in English. When counsel asked further questions, Venireperson 64 claimed she had only understood less than half of the voir dire presentation. She further explained it would take her a long time to understand what she read in English because she suffered from dyslexia. The trial court asked Venireperson 64 to return to the courtroom while she continued conferencing with counsel.

The State offered that one venire member could still be seated on the jury because the person had not been reached due to a duplicate strike by counsel. Responding, Christmann did not agree with the State's proposition, and his counsel requested instead that an interpreter be provided for Venireperson 64. The trial court clarified and ruled that Venireperson 64 was not qualified for service based on her inability to read and write. Christmann objected, lodging "a facial challenge to the Texas code," for its exclusion of Venireperson 64. After overruling the objection, the court indicated it would call the next available panel member to replace the newly disqualified venireperson. Christmann's counsel responded that he did not have an objection to the plan. After returning to the courtroom, the trial court asked Venireperson 64 to step down from the jury box. The court then called another venireperson to serve as Juror 12. The trial court proceeded to swear in the jury of the case. The jury was then released for the weekend and asked to return the following Monday.

When trial resumed, the bailiff informed the court that Juror 8 had informed him that she did not read or write English. Outside the presence of the jury, the court and counsel interviewed Juror 8. The juror added that it was not that she did not read and write English but that it was "too difficult" for her to do so. She further explained that Spanish was her primary language; that she was born in El Paso, but she had lived in Juarez for 18 years; and that she understood less than half of what had been discussed during voir dire. The trial court ultimately concluded that Juror 8 was also not qualified to serve on the jury, and both counsel agreed. After the trial court indicated the first alternate juror would replace Juror 8, Christmann did not object.

### B. Standard of review and applicable law

When reviewing an alleged error involving jury voir dire, we are directed to review the actions of the trial court under an abuse of discretion standard. *See Kemp v. State*, 846 S.W.2d 289, 297 (Tex. Crim. App. 1992) (en banc). We will reverse only when the trial court's decision was so clearly wrong as to be outside that zone within which reasonable persons might disagree. *Id.* (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)).

The Code of Criminal Procedure provides that a challenge for cause may be made by either the state or the defense on the basis that a juror cannot read or write. Tex. Code Crim. Proc. Ann. art. 35.16 (a)(11). "A trial court should not on its own motion excuse a prospective juror for cause unless the juror is absolutely disqualified from serving on a jury." *See Martinez v. State*, 621 S.W.2d 797, 798 (Tex. Crim. App. 1981) (en banc). When a trial court excludes a disqualified juror for cause on its own motion, the error in acting *sua sponte* is considered harmless unless the defendant shows that he or she was tried by a jury to which there existed a legitimate objection. *Montoya v. State*, 810 S.W.2d 160, 170 (Tex. Crim. App. 1989) (en banc) (applying Article 35.16(a)(11) to a prospective juror who expressed difficulty understanding spoken English).

23

## C. Analysis

Here, Christmann's brief urges that he preserved error by objecting to the court's excusal of one juror who did not read and write in English, while acknowledging he did not similarly object to a second juror who expressed the same language difficulties. In any event, once all 12 jurors were seated and sworn, Christmann did not object to the impaneled jury. Christmann contends on appeal that the trial court erred in overruling his objection calling for the trial court to provide an interpreter to the first juror rather than disqualify her from her jury service. Because Christmann did not object to the final jury seated in the case, we conclude that any error in the trial court's removal of the jurors at issue was harmless. *See Montoya*, 810 S.W.2d at 170.

Moreover, Christmann's briefing mentions a United States Supreme Court holding, which provides that exclusion of a juror from jury service because of ethnicity or nationality violates the Equal Protection Clause of the United States Constitution. *See Hernandez v. Texas*, 347 U.S. 475, 477–78 (1954); *see also Wamget v. State*, 67 S.W.3d 851, 854 (Tex. Crim. App. 2001) (per curiam). Other than a passing mention of *Hernandez*, Christmann does not elaborate or develop an argument in support of improper exclusion. Tex. R. App. P. 38.1(i) (requiring that a brief must contain a clear and concise argument of the contentions made with appropriate citations to authorities and to the record). And his reliance on *Hernandez* on appeal does not comport with the objection he made at trial where he did not articulate the basis of his "facial challenge" claim and merely asked for the court to provide an interpreter for the juror. Tex. R. App. P. 33.1. Because he did not raise improper exclusion of a juror based on ethnicity or nationality at trial and he neither develops that argument on appeal, we consider this argument waived.

Accordingly, we overrule Christmann's third issue.

24

## VI. CONCLUSION

We affirm the trial court's judgment.

GINA M. PALAFOX, Justice

November 15, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

(Do Not Publish)